**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**
Alexandria Division

GLENN H. STEPHENS, III,              )
                                      )
          Plaintiff,                  )
                                      )
     vs.                              )        Civil Action No. 1:15cv726
                                      )
TINA QUARLES,                         )        (Formerly Falls Church Virginia
                                      )        General District Court No. GV15-85)
                                      )
Defendant.                            )
_____     )

JUL - 7 2015

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VIRGINIA

### BRIEF IN SUPPORT OF
### PLAINTIFF'S SECOND MOTION TO STRIKE AND
### MOTIONS OPPOSING SUBTITUTION AND DISMISSAL

Pursuant to Local Rule 7(F)(l), the pro se Plaintiff respectfully submits this Brief in support of Plaintiff's motion to strike and motions opposing substitution and dismissal.

### I. PLAINTIFF'S MOTION TO STRIKE

Plaintiff moves that the Court strike the Government Brief for failure to conform to Rule 7(F)(3) which requires in relevant part, "All briefs, including footnotes, *shall* be written in 12 point Roman style . . . " (Emphasis added.) The language of Rule 7(F)(3) is not discretionary.

The Government Brief's text appears to be smaller than 12 point and its footnotes are even smaller. Thus, the Government's Brief should be stricken. See generally, *Beard v. Lehman Brothers Holdings, Inc.*, 458 F. Supp. 2d 1314, 1318 (M.D. Ala. 2006)(holding "the district court cannot disregard . . . procedural defect regardless of the triviality . . . of the defect."); *Prod. Stamping Corp. v. Md. Cas. Co.*, 829 F. Supp. 1074, 1077-78 (E.D. Wis. 1993)("The view that

technical flaws . . . can be swept away like so much dust seriously misunderstands the conditions under which the formidable power of the federal judiciary can-and should-be invoked").

## II. PLAINTIFF'S OPPOSITION TO SUBTITUTION AND DISMISSAL

### a. Background

The procedural motions in this case arise from deployment of the U.S. Attorney's Office on behalf of the Office of the Assistant Secretary of Civil Rights (OASCR) USDA to shield USDA employee Tina Quarles[1] from accountability for her tortious conduct on April 10, 2015. This case ended up in the courts because OASCR officials are seldom held accountable for bullying and other civil rights violations, in part because the USDA/OASCR division that investigates civil rights complaints against OASCR officials – the Corporate Services Division (CSD) – fails to conduct timely and legally sufficient investigations. The systemic accountability problems related to CSD and OASCR were the subject of a May 18, 2015 report from The Special Counsel Carolyn Lerner to the President of the United States. See attached Pl. Ex. 1.

The Employment Investigations Division (EID), originally managed by inestimable Chief Kenneth Baisden, was created to remedy the problems that afflict CSD – untimely[2] and legally

---

[1]    Ms. Quarles serves in the Employment Investigation Division (EID) of OASCR.

[2]    Under MD 110 and related regulations and guidance, investigations of discrimination must be conducted in 180 days from the date of the filing of the complaint (different time frames apply if there are post-complain amendments to the complaint or if the case is a so-called "mixed" case – i.e., a case with both EEO and MSPB issues. Because departments and agencies can face sanctions from EEOC judges at hearing for untimely investigations, timely investigation was the hallmark of performance in EID, both for the Equal Employment Opportunity Specialists processing investigations and for the division itself. When EID was created, USDA's timely case processing rate was roughly 40%, but EID eventually raised that rate into the 60%-80% range. And, in many if not most cases, untimely investigations were not primarily the fault of EID. For example, it was not uncommon that cases would reach EID investigation from Violet Hall's Employment Complaint (ECD) months after the filing of the complaint. More timely processing of complaints and issuance of "Acceptance Letters" by ECD would have raised EID's timeliness percentage to 70 to 90%.

insufficient investigations. The EEO specialists (EOS) originally assigned to EID consisted entirely of permanent government employees, but in Fall of 2013, EID began contracting with Panum LLC to contract EEO specialists. Michelle Griffin, originally an administrative assistant, was the first Panum contractor to begin work in EID. The Plaintiff was the second, but unlike Griffin spent his entire time in EID working as an EOS. The Plaintiff was the longest serving Panum contractor in EID working entirely as an EOS, despite the fact that he was the only EOS without previous experience working in OA or OASCR.

The Plaintiff's work was consistently lauded by Chief Baisden and his then Team Lead Dona Marshall. On several occasions, including in late Winter or Spring 201, Marshall expressed to the Plaintiff that EID was interested in him become a full time government employee. The Planitiff's work in EID was similarly well received by Panum LLC. The Plaintiff received a bonus of $1500 from during the holiday season of 2014 for his work in EID and received the highest rating of High ("5") in his April 10, 2015 performance evaluations. At that time, Panum also gave the Plaintiff a 3.5% raise – seventy-five percent about the standard raise. See Pl. Ex. 2.

On that performance evaluation, the evaluating official David Canayan stated:

Comment(s): Glenn has been providing an excellent support to EID within the last 17 months. He has not only processed cases well and timely, but also takes the initiative to learn systems/programs specific to EID. As a result, Glenn was able to step-in and assist agency employees when needed; in some cases, he was only given minutes notice to provide crucial information to the Agency's Leadership, which he has done successfully! He continuously finds ways to improve internal processes within EID, works well with other vendors and investigators who support EID as well, and encourages other team members to focus on providing excellent support to EID, despite the inevitable challenges that come with EID's mission. Glenn is very passionate of the support he provides to EID and is willing to go the extra mile to ensure our client's mission is completed. His actions are not only good reflections to himself, but also to Team Panum!  See Pl. Ex. 2.

Roughly a month later, in largely due to the efforts of Tina Quarles, the Plaintiff was informed that his contract would not be renewed.[3] He was discharged on May 25, 2015.

The work environment in EID for Panum contractors was "toxic" as accomplished EID contactor Yamil Jaskille, Esq.[4] put it. This "toxicity" was largely a product of Quarles disregard for the Panum contractors and her animus for those holding advanced degrees. Quarles, a non-lawyer who purportedly attended law school (it was unclear whether she dropped out of law school, never took a bar examination or was unable to pass a bar examination).[5] Regardless, Quarles harbors considerable animus against attorneys. In a conversation with the Plaintiff regarding an inquiry from the USDA's Office of General Counsel regarding the complaint filing, Quarles said the OGC Counsel was "from the lowest level of the gene pool." On April 7, 2015, in a thinly veiled attack on the Plaintiff and Jackie Williams (another Panum contractor with a law degree), Quarles said, "It's a lower gene pool of people and I don't want to work with them anymore." Similar invective, motivated by Quarles disdain for those holding advance degrees was directed at those having Ph.D. In a thinly veiled attack on the Plaintiff,[6] on or about March 16th Quarles railed, "What use is a Ph.D.? Who needs a Ph.D? I don't need no encyclopedia."

---

[3]   Although the Plaintiff would subsequently engage the informal EEOC process and later request that a complaint be filed (initiating the formal EEO stage), the Plaintiff's EEO allegations and complaint did *not* and do *not* include the April 10, 2015 incident that was the subject of the Plaintiff's Small Claims defamation actions (GV 15-54 and GV 15-84). Thus, the Plaintiff's EEOC activities are irrelevant to this case, contrary to the Brief of Ms. Free.

[4]   See http://americounsel.com/team-view/yamil-jaskille/

[5]    Griffin, like her personal friend Quarles, attended law school, but has not passed a bar examination.

[6]   The Plaintiff earned a Ph.D. in Political Science from UCLA and was the only EOS holding a Ph.D. Quarles was well aware of this because her friend Tysan Williams (the only government EOS in EID with a law degree), who occupied the cubicle adjacent to Quarles was friendly with the Plaintiff and referred to him as "Dr. Stephens."

Quarles disdain for contractors, particularly those holding advanced degrees, led to more than derision. Quarles played a central role in the removal from EID of four Panum EID contractors with law degrees – Meisha Hunter, Yamil Jaskille, the Plaintiff and Jackie Williams.

The Plaintiff kept himself out of Quarles line of fire for nearly a year and a half. But the Plaintiff believes that two events in Spring 2015 put him in her sights. In Spring of 2015, only two contractors with law degrees remained in EID – the Plaintiff and Jackie Williams (the Plaintiff worked full-time, Williams part-time). After the Agency assignments of EOSs were rearranged, with the Plaintiff moving to the Forest Service from APHIS and RMA and Williams moving from the Forest Service to APHIS and RMA, Williams and the Plaintiff discussed the switch. Williams said, "At least I don't have to work with Tina anymore." Not long thereafter, early one morning, the Plaintiff believing Quarles was not yet at work (she normally arrived later), the Plaintiff mentioned Williams remark to Jeff Carr, a government EOS in the cubicle alongside the Plaintiff's. But immediately after saying that, the Plaintiff heard rustling from the cubicles on the other side of the divider and then discovered Quarles was there.

But it is even more likely that it was the Plaintiff's refusal to kite the Ahmed ROI that put a target on his back. That case was assigned to Michelle Griffin. But when Michelle was on vacation he was asked to review the ROI to insure that the modifications requested by Griffin of the vendor-investigator has, in fact, been done. Such assistance on cases, typically referred to as "a second set of eyes" was a commonplace in EID. The Plaintiff's review of the ROI not only found that the investigator (Wendy Moore) and/or the vendor (ICRIS) failed to make some of the modifications that Griffin requested, but that Griffin (who was relatively new to EOS work), had missed several other problems with the ROI. Most importantly the ROI lacked bookmarks (required by the EEOC) and illegible documents. Since, left uncorrected those mistakes in the

5

ROI could lead to an EEO order requiring correction if the case went to hearing, those modifications were not discretionary. And because those modifications had to be made before the ROI could "go to final" (go to a final draft for distribution to the Complainant), the Plaintiff requested other modifications. These modification requests were sent via e-mail directly to the investigator from the Plaintiff on March 4, 2105 and March 9, 2015.

When Quarles learned of these modifications requests, she was livid. When Quarles claimed that Plaintiff should have gained approval for the additional modifications from the Acting Team Lead Tysan Williams, Stephens e-mailed Quarles, who was sitting about a dozen feet away, pointing out correctly that Ms. Williams was not the Acting Team Lead at the time. (There was a gap between the end of Ms. Williams tour as Acting Team Lead and Quarles tour which began on or about March 23, 2015 and ended on or about May 5, 2015 after the Plaintiff complained to Quarles' superiors about her bullying and harassment). In fact, Quarles contention that Plaintiff should have gotten Acting Team Lead approval for the requested modifications was inconsistent with standard EID procedure. Although EOSs needed Acting Team Lead approval for more involved modifications or supplements to ROIs (like gaining the testimony of a missing witness), EOSs did not need and did not typically ask for Acting Team Lead approval for routine modifications like those requested by the Plaintiff on March 4 and 9, 2015. Indeed when the Plaintiff "reality tested" Quarles claim that Acting Team Lead approval was needed for routine modifications to ROIs with Bridgette Jones, a senior government EOS with as much or more experience as Quarles, Jones looked at the Plaintiff incredulously and said "That's news to me."

In fact, Quarles' Acting Team Lead groundless "Acting Team Lead" objection the modifications requested by the Plaintiff was a pretext. She was angry because the Plaintiff failed to kite the flawed ROI, thereby slowing the distribution of her friend Michelle Griffin's ROI.

In week or so after the disagreement over those modifications, Quarles began harassing and bullying the Plaintiff. That bullying consisted not only of derisive and defamatory comments, but also thinly veiled threats that Quarles would "get" the Plaintiff when she became Acting Team Lead. Such comments were particularly pronounced in the period between March 16 and March 17, 2015 when Acting Chief Marshall was on a management retreat in West Virginia. During that period, in expletive filled tirades within of Plaintiff's earshot, Quarles made it clear that when she became Acting Team Lead that she would "get" the Plaintiff, Williams and Moses Brown. Although Brown was a government EOS, Quarles referred to him as a "GS 13 not pulling his weight." By June, the Plaintiff, Williams and Brown had been removed.

On March 20, 2015, the ROI that was the subject of the controversy was distributed (i.e., sent to the Complainant and his counsel) by Griffin. The distribution letter accompanying the ROIs was signed by Quarles. The plaintiff was not involved at that point (indeed it appears that distribution happed after the Plaintiff left the office that day.) Significantly for this case, Griffin failed to upload the ROI onto Icomplaints at that point. As a result, on April 10, 2015, when the Agency complained that the ROI was not uploaded (the Complainant elected a hearing), Quarles seized the opportunity to blame the Plaintiff for that failing in an e-mail to the Agency.

The Plaintiff learned of Quarles defamatory comment two day later when Acting Chief Marshall circulated the email exchange between Quarles and the Agency to all of EID.

That defamatory email by Quarles on April 10, 2105 is the incident or transaction from which the Plaintiff's Small Claims cases GV 15-54 and GV 15-84 arose. That transaction was also alleged as a violation of the FTCA in the Plaintiff's recently filed administrative action. But contrary to Ms. Free, that incident was not included in his EEOC case. In fact, the Plaintiff filed

his first defamation action more than a month and a half before he requested that by CSD

advance his case from the informal stage to the formal stage by filing an EEO complaint.

In April, the Plaintiff brought Quarles bullying to the attention of Panum. Panum's Vice

President for Acquisitions & Contracts, Patsy Palmer e-mailed to the Plaintiff:[7]

> Glenn,
>
> I am sorry you or any Panum employee have to go through that type of
> harassment and it is harassment. Respect goes both ways. You and the others are
> there to assist the Government in meeting their critical mission objectives, not to
> take their jobs. They should welcome the assistance because it makes their
> operation successful. I think Dhavid needs to point this out to Dona in a nice
> diplomatic way. The Government would not tolerate this type of behavior from
> Contractor employees and I will not tolerate it from Government employees.
> While Dona is quick to point out any issues with our employees, we too need to
> do the same thing. So you have a comfort level, perhaps Dhavid can discuss his
> discussion strategy with you before talking to Dona. I know you are a very good
> worker and if there are barriers that are keeping you from being successful on the
> job, Panum needs to step in to remedy the problem.
>
> You are a valued employee and we want to work with you to retain your services
> for a long time to come.
>
> Respectfully,
>
> Patsy

**b. Procedural History**

On April 16, 2105, the Plaintiff filed a Warrant In Debt in Small Claims Court in Falls

Church, Virginia, alleging defamation per se against Ms. Quarles.[8]

In the first week of April 2015, Dr. Stephens (a federal contractor working in the

Employment Investigations Division (EID) of the Department of Agriculture) discussed bullying

and harassment by a co-worker Tina Quarles with his Project Manager, Dhavid Cayanan of

---

[7]   See e-mail attached as Plaintiff Exhibit 3.

[8]   The Warrant in Debt in GV 15-54 related to a defamatory communication on April 10, 2015.

Panum LLC. On or about April 6, 2015, Cayanan met with Ms. Quarles' immediate supervisor – EID Acting Chief Dona Marshall. On April 9, 2015, alerted Cayanan that Quarles bullying and harassment worsened after Cayanan's talk with Marshall. As a result, on April 17, 2015, Dr. Stephens met with Marshall's immediate supervisor, Carl-Martin Ruiz, the Director of the Office of Adjudication.[9]   On April 23, 2015, Dr. Stephens again met with OA Director Carl Martin Ruiz, along with OA Deputy Directors Violet Hall and Kirk Perry, EID Acting Chief Dona Marshall, and Panum LLC Human Resources Director Angela Albanese to discuss the problem.

On or about May 5, 2015 Ms. Quarles was removed from the position of Acting Team Lead in the Employment Investigations Division.[10]

On May 10, 2015, the return date for GV 15-54, Dr. Stephens non-suited. See Plaintiff Ex. 1. As a result of the non-suit, no trial date was set by Judge Kelly and no Bill of Particulars was ordered or requested of GV 15-54.

On May 20, 2015, Dr. Stephens was subjected to yet another round of bullying by Ms. Quarles. Shortly thereafter he informed Ruiz, Hall, Perry, Albanese, and Cayanan.

The next day, May 21, 2015, Dr. Stephens filed another defamation action in Falls Church Small Claims Court. That defamation action was assigned case number GV 15-85.[11] The Plaintiff requested and received a return date of July 10, 2015 for that case.

---

[9]   Mr. Ruiz serves as Director of USDA's Office of Adjudication, a branch of OASCR that includes EID.

[10]   This was not the first action by OA/EID managers regarding Quarles workplace conduct. Ms. Quarles discussed the fact that in her FY 2014 performance evaluation she received a lower rating in the "Professional Relations" element from then EID Chief Kenneth Baisden.

[11]   The Warrant in Debt in GV 15-85 related to defamatory communication on April 10, 2015.

That same day, on May 21, 2015, Dr. Stephens contacted Katrice Jackson of USDA's Corporate Services Division (CSD)[12] and expressing a desire to enter into the informal EEO process. That date – May 21, 2015 – is the date of Dr. Stephens initial EEO contact.

On Saturday, June 6, 2015, U.S. Attorney Dana Boente provides a *Westfall* certification in support of removal of GV 15 – 84.

On June 9, 2015 at 2:16 PM, the Notice of Removal is filed with the Clerk, US District Court, Alexandria, Virginia.

On June 10, 2015, on or about 9:30 AM, when case GV 15-85 was called by Judge Kelly, US Attorneys Ayana Free and Dennis Barghaan rose to remove the case based on US Attorney Boente's *Westfall* certification. Due to removal, no trial date was set by Judge Kelly and no Bill of Particulars was ordered or submitted for CV 15-84.

On or about June 12, 2015, Dr. Stephens receive a mailed copy of the Notice of Removal mailed to him by U.S. Attorney Ayana Free on June 9, 2014.

On June 12, 2015, Dr. Stephens asks CSD to file formally his EEO complaint.

On June 14, 2015, Dr. Stephens mailed a ccopy of the Bill of Particulars for GV 15-84 to the Clerk of the Court, Falls Church. The Bill of Particulars for GV 15-84 sent on June 14th was delivered to the Clerk of the Court on June 16, 2015 at 9:40 AM.

On June 15, 2015 Dr. Stephens mailed a courtesy copy of the Bill of Particulars for GV 15-84 to former defendant Tina Quarles. The Bill of Particulars for GV 15-84 sent on June 15th was delivered to Ms. Quarles on June 18, 2015 at 7:40 AM.

---

[12] CSD investigates complaints in "conflict cases." Dr. Stephens' case was referred to CSD because it alleges discrimination, harassment and retaliation by Marshall and Quarles.

On June 22, 2015, acknowledged receipt of the Bill of Particulars for GV 15-84 in the process of providing a copy of that Bill of Particular to the Court, thereby including that Bill of Particulars into the record evidence of Civil Action No. 1:15cv726.

On June 22, 2015, Dr. Stephens submitted a detailed account of the allegations and incidents of discrimination, harassment and retaliation in his EEOC case to Dedan Bruner, the CSD Counselor assigned to handle the informal stage of Stephens' complaint. The April 10, 2105 incident "out of which the plaintiff's claim arose" in GV 15-54 and GV 15-85 was **_not_** included in the allegation or incidents submitted to CSD by Dr. Stephens on June 22, 2015.

On June 24, 2015, Dr. Stephens filed with USDA a timely Federal Tort Claims Act FTCA) administrative claim against the United States related to the incidence on April 10, 2015. The transaction that is the subject of the June 24, 2015, FTCA claim is the same transaction or incident "out of which the plaintiff's claim arose" in GV 15-54 and GV 15-85.

**b. Applicable Law**

There is a presumption against removal jurisdiction. *Fajen v. Foundation Reserve Ins. Co.*, 683 F.2d 331, 333 (10th Cir.1982);see also generally James Wm. Moore, MOORE'S FEDERAL PRACTICE, § 107.03, at 107-20 (3d ed. 2011) (stating that of the three ways to invoke federal jurisdiction—by filing in federal court, by removal, or by seeking federal-court review of a state judgment—removal "is the most peculiar and difficult of the three"); Scott Dodson, In Search of Removal Jurisdiction, 102 NW. U. L. REV. 55, 57 (2008) (noting that "the removal provisions are a convoluted scheme that lacks a single, uniform historical pedigree of consistent jurisdictional treatment").

The reasons for the presumption are several-fold. First, removal subverts the usual rule that the plaintiff gets to choose the forum in which the plaintiff's claims will be heard. See

Charles Alan Wright & Mary Kay Kane, LAW OF FEDERAL COURTS, § 38, at 224 (7th ed. 2011) (referring to removal as "quite an anomalous jurisdiction, giving a defendant, sued in a court of competent jurisdiction, the right to elect a forum of its own choosing"). Second, removal wrests a case from the state court's hands even though the state court had entirely proper jurisdiction. Moore, *supra*, § 107.03, at 107-21 (arguing that because removal "deprives the state court of an action properly within its jurisdiction, which raises federalism concerns."); Dodson, *supra*, at 70 (removal invokes federalism concerns because it "plucks a case from a state court of competent jurisdiction, without the state court's consent, and deposits the case in the federal system, all at the whim of one of the parties"). Third, removal creates the potential of disrupting the state court's proceedings after the court has given attention to the case. See Dodson, supra at 70–71 (noting that removal has been viewed narrowly because removal occurs "after the state court has become invested in it and expended judicial resources overseeing it").

These concerns have led the Supreme Court to state that the removal statutes should be strictly construed, *Shamrock Oil Gas Corp. v. Sheets*, 313 U.S. 100,108-09 (1941). *See generally* Paul E. Lund, Federally Chartered Corporations and Federal Jurisdiction, 36 F.S.U. L. REV. 317, 364–65 (2009) (discussing the strict construction rule and the presumption against federal jurisdiction). All doubts are to be resolved against removal. *Greenshields v. Warren Petroleum Corp.*, 248 F.2d 61, 65 (10th Cir.), cert. denied, 355 U.S. 907 (1957).

The party seeking removal has the burden of proving the jurisdictional and procedural requirements for removal. *Laughlin v. Prudential Ins. Co.*, 882 F.2d 187 (5th Cir. 1989); ("The burden is on the defendant or defendants who seek removal to show that federal jurisdiction is proper.") Moreover, if the defendants fail to follow the proper procedure for removal, this can

serve as a basis for remanding the case to state court. See MOORE, supra, § 107.41[1][a][ii], at 107-192 to 107-196 (discussing remand based on procedural defects).

The *Westfall* Act (Act), 28 U.S.C. § 2679(d) provides for removal of cases from state to federal court and substitution of the United States as the defendant. The Act's Section 2679(b)(1) "accords federal employees absolute immunity from common-law tort claims arising out of acts they undertake in the course of their official duties." *Osborn v.Haley*, 549 U.S. 225, 229 (2007).

The Act empowers the Attorney General to certify that the employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." *Osborn*, 549 U.S. at 229–30. Then, "[u]pon the Attorney General's certification, the employee is dismissed from the action, and the United States is substituted as defendant in place of the employee." Id. at 230. The case "is thereafter governed by the Federal Tort Claims Act (FTCA), 60 Stat. 842." Id.[13]  Thereafter, the plaintiff, "despite the seeming unfairness, cannot proceed against the individual defendant[s]. *Maron v. United States*, 126 F.3d 317, 319 (4th Cir.1997) citing *United States v. Smith*, 499 U.S. 160, 165 (1991).

In *Gutierrez de Martinez v. Lamagno*, 515 U.S. 417 (1995), the Supreme Court held that the Attorney General's scope-of employment certification made under § 2679(d)(2) serves two offices. It conclusively establishes removal jurisdiction in the federal court, a consequence that is not judicially reviewable. See id. at 432. It forms the basis for the United States to be substituted as defendant, a consequence that is subject to judicial review. See 515 U.S. at 434. ("Congress made the Attorney General's certificate conclusive solely for purposes of removal, and notably not for purposes of substitution.")

---

[13]   Dr. Stephens concedes that if the United States were substituted, the government's waiver of sovereign immunity is bound by the FTCA, thereby barring his defamation per se claim. Thus, the viability of the defamation per se claim against defendant Quarles in her individual capacity hinges upon Dr. Stephens challenge to the validity of *Westfall* certification.

13

Section 2679(d)(2) states explicitly that "certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal." . . . Notably, §2679(d)(2) contains no such statement with regard to substitution. The §2679(d)(2) prescription thus tends in favor of judicial review.

Under judicial review of the *Westfall* certification with regard to substitution , the U.S. Attorney's certification "does not carry any evidentiary weight unless it details and explains the bases for its conclusions," *Maron*, 126 F.3d at 323. The certification "serves as prima facie evidence and shifts the burden to the plaintiff to prove, by a preponderance of the evidence, that the defendant federal employee was acting outside the scope of his employment." *Gutierrez de Martinez v. Drug Enforce. Admin.*, 111 F.3d 1148, 1153 (4th Cir. 1997); *Kimbro v. Veltenig* , 30 F.3d 1501, 1509 (D.C.Cir.1994) (certification is "entitled to 'prima facie ' effect" and "obliges the plaintiff to come forward with evidence supporting his allegations);. *Borneman*, 213 F.3d at 827 ("To carry its burden, the plaintiff must submit 'specific evidence or the forecast of specific evidence contradicting the certification, not mere conclusory allegations and speculation.'"

In determining whether the plaintiff, has, in fact, met his prima facie case, the district court may not simply defer to the certification decision. Instead, "the scope-of-employment question is one of law and thus must be reviewed under a de novo standard." *Webb*, 24 F.Supp.2d at 613. If the plaintiff presents persuasive evidence refuting the certification, the Government must then come forward with evidence and analysis to show that the alleged torts occurred within the scope of employment. *Gutierrez de Martinez.*, 111 F.3d at 1155.

**c. Discussion**

### i. The Court Should Rule the Certification Substantively Invalid and Remand

The statutory provision governing remands of cases wrongly removed to federal court, 28 U.S.C. §1447(c) provides for remand to state court for both procedural and substantive reasons:

14

A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal . . . . If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.

The Plaintiff moves that the Court, based on the existing record, find Boente's Westfall certification substantively invalid, rule that it lacks subject matter jurisdiction, and remand.

Pursuant to the Supreme Court's instructions in *Osborn* and *Lamagno*, courts have held that a plaintiff can challenge a *Westfall* certification without an *Osborn* hearing. No hearing is necessary if the certification, pleadings, affidavits, and supporting documents fail to reveal an issue of material fact." *Lee v. United States*, 171 F. Supp. 2d 566, 574 (M.D.N.C. 2001); *Schrob v. Catterson*, 967 F.2d 929 (3d Cir.1992)(calling for a hearing only where there is a genuine factual dispute); *Kashin v. Kent*, 457 F.3d 1033, 1043 (2006) (holding that denial of an evidentiary hearing regarding certification is proper if "the certification, the pleadings, the affidavits, and any supporting documentary evidence do not reveal an issue of material fact.");

No *Osborne* hearing is needed because there can be __no__ dispute of material fact that on June 6, 2015, Mr. Boente, did not know the specific "incident out of which the plaintiff's claim arose." And because Mr. Boente did not know the specific incident out of which claim arose, the he could not certify that the incident occurred in the scope of Ms. Quarles employment.

The Plaintiff's contention that Mr. Boente was literally clueless was on June 6th, as to the specific incident giving rise to Dr. Stephens claim, is not a mere conclusory allegation or speculation. Compare *Lee v. United States*, 171 F. Supp. 2d at 574 (holding that because the plaintiff failed to proffer evidence, beyond mere conclusory allegations, that the plaintiff failed to rebut the certification); *cf Burrell v. United States*, 2001 WL 34047380 (2001) (finding substitution proper "because the Plaintiff failed to introduce *any* evidence")(emphasis added),

The Plaintiff submits the following evidence establishing the certificate's invalidity –

A motion to remand the case on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days after the filing of the notice of removal . . . . If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.

The Plaintiff moves that the Court, based on the existing record, find Boente's Westfall certification substantively invalid, rule that it lacks subject matter jurisdiction, and remand.

Pursuant to the Supreme Court's instructions in *Osborn* and *Lamagno*, courts have held that a plaintiff can challenge a *Westfall* certification without an *Osborn* hearing. No hearing is necessary if the certification, pleadings, affidavits, and supporting documents fail to reveal an issue of material fact." *Lee v. United States*, 171 F. Supp. 2d 566, 574 (M.D.N.C. 2001); *Schrob v. Catterson*, 967 F.2d 929 (3d Cir.1992)(calling for a hearing only where there is a genuine factual dispute); *Kashin v. Kent*, 457 F.3d 1033, 1043 (2006) (holding that denial of an evidentiary hearing regarding certification is proper if "the certification, the pleadings, the affidavits, and any supporting documentary evidence do not reveal an issue of material fact.");

No *Osborne* hearing is needed because there can be **no** dispute of material fact that on June 6, 2015, Mr. Boente, did not know the specific "incident out of which the plaintiff's claim arose." And because Mr. Boente did not know the specific incident out of which claim arose, the he could not certify that the incident occurred in the scope of Ms. Quarles employment.

The Plaintiff's contention that Mr. Boente was literally clueless was on June 6th, as to the specific incident giving rise to Dr. Stephens claim, is not a mere conclusory allegation or speculation. Compare *Lee v. United States*, 171 F. Supp. 2d at 574 (holding that because the plaintiff failed to proffer evidence, beyond mere conclusory allegations, that the plaintiff failed to rebut the certification); *cf Burrell v. United States*, 2001 WL 34047380 (2001) (finding substitution proper "because the Plaintiff failed to introduce *any* evidence")(emphasis added),

The Plaintiff submits the following evidence establishing the certificate's invalidity –

- <u>The plain wording of the certification</u>. Although the Plaintiff alleges a single allegation of defamation, the certification uses the plural, averring "I am familiar with the *allegations* made in the warrant of debt filed by the plaintiff, Glenn H. Stephens, in *Glenn H. Stephens, III v. Tina Quarles*, Case No. GV15-85 (Falls Church Gen. Dist. Ct.), pending in the Falls Church General District Court . . . . with respect to the *claims* set forth therein . . . (Emphasis added). If, as Boente claimed, he was familiar with the incident from which the Plaintiff's claim arose, he would have used the singular in his certification. The fact he used the plural proves that Boente actually had no familiarity with the **allegation**.

- <u>The date of the certification</u>. The certification is date June 6, 2015. On June 6th only the Plaintiff knew the specific incident from which his allegation arose. Boente did not.

- <u>The informational impact of removal</u>. Removal prevented the defendant and/or the US Attorneys from learning the specifics of the allegation. Absent removal, if Quarles had appeared without counsel, GV 15-84 would have been referred to mediation and, if mediation failed, to trial that day. Had this sequence unfolded, Quarles would learned of the specific allegation, either at mediation or at the hearing. Absent removal, if Quarles had appeared with counsel, the case would have been removed to General District Court and pursuant to that removal, Judge Kelly would have scheduled a trial date and dated for the Bill of Particulars and Grounds for Defense. Ms. Quarles would then have learned of the specific allegation upon receipt of the Bill of Particulars. Instead, Quarles and the US Attorney's only learned of the specific nature of the allegation on or after June 18, 2015.

- <u>Ms. Free's EEO Speculation</u>. Because Ms. Free had no knowledge of the specifics of the Plaintiff's defamation allegation prior to June 18, 2015, she could only speculate about the nature of the incident in her June 16th Brief. Contrary to the facts, she speculates in

16

part 3 of her "Factual Background" that the incident in question is contained in the Plaintiff's EEO complaint. This wildly inaccurate claim is repeated in her footnote 4. [14]

- <u>Ms. Free's Unlawful CSD Fishing Expedition.</u> Not knowing the specifics of the Plaintiff's defamation allegation, Ms. Free went fishing. Despite the fact that Mr. Boente purported familiarity with the incident from which the allegation arose meant that the US Attorney's office had no interdepartmental need-to-know, Ms. Free obtained, without his consent, a copy of the Plaintiff's intake form and information about his complaint from Candace Glover, and, in violation of the Privacy Act released that information in her Brief. This Privacy Act violation by Ms. Free is ironic given her fastidiousness about the Privacy Rights of the Complainant in the case related to the defamation alleged in the Bill of Particulars. In her Brief, Ms. Free took the liberty of divulging a form and other information related to my informal EEO claim, in violation of the Privacy Act, but redacted the name of the Complainant in her "Notice of Continued Filings in State Court." Both Ms. Free's fishing expedition with Ms. Glover and CSD and her unlawful divulgence of my Privacy-Act-protected EEO informaation result from the fact that in

---

[14] In her footnote four, Ms. Free not only proved she was clueless regarding the actual allegation of the Plaintiff, but shows her ignorance of EEO procedure. Contrary to Ms. Free, the intake form she obtained from Candace Glover, in violation of the Privacy Act, is not an "EEO complaint." The intake form is a preliminary document used in the informal stage of the EEO process. That document and others provides a foundation for the informal stage's counselor's report (CR). If the case is not resolved in the informal state, through shuttle-diplomacy type settlement efforts or mediation, the Aggrieved Party then has the option of filing a formal complaint. The filing of that formal complaint leads to the issuance of a so-called acceptance letter, which formalizes the allegations in the form more like that characteristic of "notice pleading" under the Federal Rules of Civil Procedure. Thus, the notion that the Plaintiff's informal stage intake form should satisfy federal notice pleading requirements is a windmill Ms. Free Quixotically chases in her fantasies. Even sillier is Ms. Free's claim that the Plaintiff's failure to fulfill federal notice pleading requirements on his EEOC informal stage intake form would somehow be fatal to a related FTCA administrative claim. This preposterous claim overlooks the fact that the Plaintiff's FTCA was timely submitted on Standard Form 95. The notion that the Plaintiff surreptitiously cabined his FTCA claim in his EEO informal stage intake form is yet another windmill existing only in the fantasies of Ms. Free.

to defend the indefensible conduct of Ms. Quarles, Ms. Free removed the state case prior to the issuance of a Bill of Particulars.

For all these reasons, the Boente *Westfall* petition was invalid. Because the Government's Removal Notice was not supported by a valid certification, the record is devoid of facts sufficient to permit a reasoned determination as to whether Ms. Quarles was acting within the scope of her federal employment. Given these failure, the Government's motion to substitute should be denied because the Government, as the proponent of the motion, has the responsibility of establishing a sufficient basis for granting it – i.e., a valid *Westfall* certification. *Wilson v. Republic Iron and Steel Co.*, 257 U.S. 92, (1921). Instead, the existing record contains only bare, conclusory assertions by Ms. Free and Mr. Boente that Quarles defamatory conduct took place in scope of her federal employment. Such bare assertions are insufficient to support the Government's motions for substitution and dismissal.

The *Westfall* Act plainly triggers removal only upon certification. But here, the Removal Notice was unsupported by a valid Westfall petition. Given this, the trigger for removal and transfer of jurisdiction was not pulled, and thus, the Federal District Court for the Eastern District of Virginia (Alexandria Division) never obtained or had subject matter jurisdiction. Section 1447(c) requires remand if the district court "lacks subject matter jurisdiction" over a removed case (If at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded.") Remand is not discretionary.

The Government will likely counter that this argument runs counter to the well-established rule that the *Westfall* certification is conclusive for purposes of removal. But the fact in this case of first impression are distinguishable from the long series of cases cited as authority for the proposition that certification is conclusive for removal. In those cases, the *Westfall* certification rests on familiarity or knowledge of the "incident out of which the plaintiff's claim

18

arose" and the parties disagree on whether that incident occurred in the scope of employment. But here, U.S. Attorney Boente had no knowledge of the event or incident from which Dr. Stephens defamation action arose, precluding valid certification of scope of employment.

Because the *Boente* certification is a nullity, this case is akin to removal cases in which the U.S. Attorney refuses certification. In such cases, based on the refusal to certify, the district court will hold that the employee was not acting within the scope of employment, and remand. See, e.g., *Snodgrass v. Jones*, 957 F.2d 482, 484 (7th Cir.1992); *Schrob v. Catterson*, 967 F.2d 929, 934 n. 8 (3d Cir.1992)(finding a "removal case may be remanded when the Attorney General refuses to certify scope of employment.") This Court should do likewise and remand.

### ii. The Court Should Set Aside the Substitution Based on the Record Evidence

Assuming arguendo that the Court refuses to remand and deems the Boente certification to be prima facie evidence for purposes of substitution, the Plaintiff moves that the Court set aside the substitution based on the certification, pleadings, documentary evidence, and affidavits. See *Caesar v. United States*, 258 F.Supp.2d 1, 3-4 (D.D.C. 2003) ("If the Court may independently determine, taking all of the allegations of the Complaint as true, and making all reasonable factual inferences in the plaintiff's favor, that, as a matter of law, the alleged tortfeasor was acting [outside] the scope of her employment when plaintiff was injured, then no evidentiary hearing is required.").

> The scope certification is prima facie evidence that the employee's challenged conduct occurred within the scope of employment, but it is not conclusive. Thus, a plaintiff challenging the certification has the burden of coming forward with specific facts rebutting it. If the facts can be determined without an evidentiary hearing, the court can rule on a pretrial motion to substitute or to set aside the substitution based on the certification, pleadings, documentary evidence, and affidavits. *Schrob*, 967 F.2d at 936.

19

In *Maron*, the 4th Circuit held that "If the plaintiff presents persuasive evidence refuting the certification," the burden shifts to the Government to "provide evidence . . . to support its conclusion that the torts occurred within the scope of employment." 126 F.3d at 323. Based on the existing record evidence, the Plaintiff has met his burden, but the Government has not.

The Government has had two bites at this apple and failed both times.

As discussed above the *Boente* certification is a nullity – it lacks any details, fails to explain the bases for its conclusions and provides no evidence that Quarles was acting within the scope of her employment. See *Maron*, 126 F.3d at 323(holding the certification "does not carry any evidentiary weight unless it details and explains the bases for its conclusions.")

### a. Like the Certification, Ms. Free's Brief fails to Identify the Alleged Tortious Act

The Brief of Ms. Free suffers from similar shortcomings. Relying largely on the perjured Boente certification, Ms. Free's Brief provides little argument or evidence supporting the proposition that Ms. Quarles was acting within the scope of her federal employment under the Second Restatement of Agency. The only semblance of evidence or argument in the Brief related to the applicable agency test consists of that following conclusory statement in footnote 1:

> Quarles' alleged defamatory actions (e.g., critiquing plaintiff's work product) derived from or were incidental to her position as an EOS and "Acting Team Lead" over a group of coworkers and clearly well within the scope of her employment. See Free Brief at footnote 1.

Notably, like the Boente certification, this conclusory statement by Ms. Free fails to identify the specific event that gave rise to the Plaintiff's claim, let alone argue and prove with specificity that the conduct in question occurred within the scope of employment. Indeed, like Mr. Boente's certification, Ms. Free Brief fails to get the number of defamatory actions right. Despite the fact that the Plaintiff alleged a single act of defamation, Mr. Free's brief uses the plural and refers to "Quarles' alleged defamatory *actions*." (emphasis added.)

Having wrongly guessed the number of alleged defamatory event(s), Ms. Free next hazards a guess that the type of defamatory events at issue – "e.g., critiquing plaintiff's work product." Lacking any knowledge of the actual incident in question, Ms. Free speculates, guessing that the Plaintiff contends that Ms. Quarles defamed him by critiquing his "work product." This is not only untrue, but Ms. Free guess is precisely the kind of groundless speculation that courts have consistently ruled against in certification challenge cases.

In this regard, what is good for the goose is good for the gander. Just as federal courts consistently find that mere conclusory statements do not meet the burdens of plaintiffs challenging Westfall certifications, this court should find that conclusory statements do not satisfy the Governments burden. To paraphrase *Borneman*, "To carry its burden, the [Government] must submit 'specific evidence . . . [supporting] the certification, not mere conclusory allegations." Borneman, 213 F.3d at 827.

### b. Ms. Free's Scope of Employment Argument Misstates the Law

Committing the professional ethical violation of a lack of candor with a tribunal, Ms. Free's brief misstates the law related to scope of employment. At footnote 3 of her brief, citing *CAIR v. Ballenger*, 444 F.3d 659, 663 (D.C. Cir. 2006), Ms. Free writes

> District of Columbia law follows the Restatement (Second) of Agency (1958) (the "Restatement") in defining the scope of employment. Id According to the D.C. Circuit, an act is within scope of employment under District of Columbia law if it was of the same general nature as that authorized by the employer or incidental to authorized duties. See id. at 664 (internal citations omitted)

Ms. Free misstates the law and the Restatement's test. The Second Restatement's Scope of Employment Sections (§ 228 and § 229) are multi-factor, written in the conjunctive. Ballenger expressly states this - "the Restatement's use of the conjunctive." Thus, under the Restatement and well established law, including *Ballanger*, all prongs of the Restatement's scope of

21

employment test must be met. Whether the conduct of the servant is "authorized" or not, is just one prong of the many prongs of scope of employment test found in the Second Restatement. Section 228 consist of five prongs, and authorization is mentioned in just two of those five prongs - § 228(1)(b) and § 228(2). Section 229 consist of 11 prongs, and "authorization is mentioned in just four of those five prongs - § 229(1), § 229 (2), § 229 (2)(g), § 229 (2)(i).

Contrary to Ms. Free, as held in *Ballanger*, all prongs of these tests must be met.

Like Mr. Boente's certification, the scope of employment "analysis" in Ms. Free's Brief consists of conclusory statements and speculation. To this unsavory mix, Ms. Free adds the professional ethical violation of a lack of candor with a tribunal, misrepresenting case authority with her claim that Quarles was acting within the scope of her employment simply because Quarles conduct purportedly conformed with one of the prongs of the Second Restatement. In addition, Ms. Free failed to disclose to legal authority known by Ms. Free to be directly adverse to her position – *Haddon v. United States*. 68 F.3d 1420, 1422-23 (D.C. Cir. 1995)

*Ballenger*, relied on by Ms. Free, cites *Haddon* five times, including for the proposition that "federal employees' immunity from state tort lawsuits for money damages hinges exclusively on whether they were acting within the scope of employment during the alleged incident." *Haddon v. United States*, 68 F.3d at 1422-23. But *Haddon* runs directly adverse to Ms. Free's position that Ms. Quarles intentional tort of defamation per se occurred within the scope of her employment. In *Haddon*, the DC Circuit, applying District law, found that the intentional tort of the tortfeasing electrician was unrelated to official duties and outside the scope of his employment and resubstituted the electrician as the defendant.[15]

---

[15] Although the remand portion of Haddon was subsequently overturned by the Supreme Court, its scope of employment analysis remains good law.

Ms. Free's scope of employment analysis fails as a matter of law. She speculates (wrongly) that the Plaintiff alleges more than one incident of defamation and hazards a wrongful guess at the type of defamation ("critiquing [sic] work product"). Her legal analysis conveniently overlooks the conjunctive nature of the Restatement (despite the fact that *Ballenger,* on which she relies, expressly mentions that the Restatement is conjunctively worded) and conveniently overlooks *Haddon*, which *Ballenger* cites five times.

### c. Applying the 2nd Restatement, the Court Should Rule that Ms. Quarles Acted Outside the Scope of her Employment When She Defamed the Plaintiff on April 10, 2015

Ms. Free's scope of employment analysis, and her contention that Quarles intentional tortius conduct fell within the scope of her work overlooks both well-established District law and the facts. In addition to *Haddon*, Ms. Free overlooks the District of Columbia's formulation of the Second Restatement test "'excludes from the scope of employment all actions committed solely for [the servant's] own purposes.'" *Stokes v. Cross*, F.3d 1210, 1216 (D.C. Cir. 2003); (quoting *Weinberg v. Johnson*, 518 A.2d 985, 990 (D.C. 1986). "[T]he intent criterion focuses on the underlying dispute or controversy, not on the nature of the tort, and is broad enough to embrace any intentional tort arising out of a dispute that `was originally undertaken on the employer's behalf." *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984).

Ms. Quarles intentional tort of defamation per set was committed for her own purposes – her oft stated goal of driving the Plaintiff from his position in EOS or having him removed by a supervisor or manager.[16] Removing Dr. Stephens or any other EEO Specialist was not an

---

[16]    To use the parlance of EEOC law, there is "direct" evidence of Quarles motive. In period before she became Acting Team Lead, Quarles made, within earshot of the Plaintiff, a variety of thinly veiled threats that she would get him upon becoming Acting Team Lead. Becoming Acting Team Lead simply supplied Quarles with an occasion to pursue engage in conduct well outside the scope of her employment, conduct committed solely for her own purposes, and not the purposes or goal of USDA or EID.

authorized part of Ms. Quarles temporary position as Acting Team Lead. As OA Deputy Director Kirk Perry put it in the April 23, 2015 meeting "She isn't a supervisor."

In addition to Perry's statement, the fact that Quarles was removed as Acting Team Lead roughly a week after the Plaintiff complained about Quarles efforts to chase him from EID, is evidence that she was acting outside of the scope of her employment solely for her own purposes of chasing Stephens from EID or having him removed. The Second Restatement of Agency Section 118 refers to this sort of termination of authority as revocation. To use the Restatement's terminology, Quarles authority as Acting Team Lead was revoked by her "principal" because she acting outside her authority, for a purposes of her own.

Even assuming for the sake of argument that Quarles defamatory conduct on April 10, 2015, as detailed in the Bill of Particulars now in this case's record, complied with Second Restatement Section 229 (1) as "incidental to the conduct authorized," her conduct does not conform to Section 229 (2)(a),(e), (f).

Ms. Quarles pursuit of her private end was not authorized or incidental. Even incidentally Acting Team Leads do not commonly defame EOSs in an attempt to chase them from their jobs or to get them fired (229(2)(a). Acts like constructively or actually removing or discharging EOSs, are not entrusted by Acting Team Leads, not authorized and not incidental to that position (229(2)(e). And USDA could not expect that Ms. Quarles would engage in such conduct either by authorization or incidentally simply because she was an Acting Team Lead (229(2)(f). Because Quarles was pursuing a purpose of her own on April 10, 2015, her conduct was outside the scope of her employment.

Nor were the means that Quarles adopted to pursue her private ends either authorized or even incidental to her position as Acting Team Lead. Quarles means in pursuit of that end –

intentionally lying, misrepresentation and falsification of government documents (casehandling and tracking records) were done solely in pursuit of Quarles private ends.

For example, on April 29, 2015 Quarles circulated an Open Case that wrongly included four late stage investigations for the Plaintiff. Even assuming for the sake of argument that Quarles attribution of three of those four cases to Stephens was an honest error, her attribution of McCorvey to his listed cases was knowingly inaccurate. This high profile case was taken over by Quarles on April 13, 2015, ostensibly on the pretexual grounds that Quarles would finalize the investigation faster than the Plaintiff.[17]

Yet, roughly two weeks later Quarles circulated an Open Case Report, without any correcting comment or errata that attributed McCorvey to the plaintiff. After the Plaintiff repeatedly complaint to Jeffrey Chandler – EID's record keeper – about the fact McCorvey was listed on case tracking sheets as his, McCorvey was finally moved to Quarles. Nonplussed on May 20, 2015, within knowing earshot of Stephens, Quarles asked Chandler to falsify his case tracking sheets by removal of McCorvey from her case list (and impliedly back to the Plaintiff's list). This dishonest conduct was reported contemporaneously to Director Ruiz and others.

---

[17]    The slow pace of Quarles work was the source of consternation to the Agencies to which she was assigned and the vendors with which she worked. For example, after Quarles successfully drove the contractor EOS Meisha Hunter out of EID, the Agency to which the two were assigned bemoaned the loss, confiding to Senior EOS Nettie Moment that the Agency was unhappy to see Hunter depart because , unlike Quarles, Hunter moved cases along. On June 23, 2105, a representative of a vendor who routinely worked with Quarles complained that work would often sit on her desk for weeks and weeks. Given her timeliness problems, Quarles' claim that she was taking McCorvey from the Plaintiff to expedite its processing bear no credulity. Subsequent events confirm that. In the 50 or so days that the Plaintiff have McCorvey, the investigation gained the affidavits of more than a dozen witnesses and 1500 draft ROI pages. Although Quarles took over McCorvey on April 13, 2015, the case's Report of Investigation did not issue until June 10, 2015. In those 82 days, Quarles gathered the testimony of four or five witnesses. Put simply, in McCorvey the Plaintiff gather testimony roughly 6 times as fast as Quarles.

Contrary to Ms. Free, Ms. Quarles lies, misrepresentations, circulation of records she knew to be inaccurate and request that government documents be falsified, were not authorized or incidental to her position as Acting Team Lead. Nor were Quarles intentional lies, mispresentations and falsifications part of her "critiquing" the Plaintiff's work product. These lies, misrepresentations and falsifications, or attempted falsifications were means to a private purpose of Quarles – to chase Stephens out of EID or to get him discharged from EID.

Under the Second Restatement, her conduct in the specific transaction on April 10, 2015 was also outside the scope of her employment. In her April 10, 2015 2:26 PM email, the FSIS Agency representative Ms. Dull raised the issue of the Ahmed ROI not being uploaded and Icomplaints (the online case tracking system not being updated). Similarly, EID Acting Chief Dona Marshall, asked, via email about why the ROI was not uploaded and Icomplaints updated. Rather than accurately and honestly answering these queries, Quarles seized on this occasion to disparage Stephens, wrongly stating that the case was "taken over" by the Plaintiff from Michelle Griffin, implying that the Plaintiff failed to update Icomplaints and failed to upload the ROI, thereby preventing the Agency from sending the ROI to the EEOC. None of this was true and Quarles knew that none of this was true.

Although Stephens assisted with this case when Griffin was out on vacation, the case remained Griffin's. Quarles knew this was true, at the very least because on March 20, 2015, Quarles, acting in her capacity as Team Lead, signed the so-called distribution letter for the Ahmed ROI. That letter listed Griffin as the EOS on the case. More importantly for purposes of Ms. Quarles defamation, the final processing of the Ahmed ROI was handled by Griffin, Quarles, and Chandler on Friday March 20, the day after Griffin that his help was no longer need on the case. Because Stephens was "out of the loop" when the Ahmed DOI was distributed by

Griffin and Quarles on March 20, he did not receive the customary UPS tracking information from Chandler. And because Stephens was not involved in the distribution of the ROI on March 20, 2015, and because the case was Griffin's, Stephens was not responsible for updating Icomplaints or uploading the ROI. Updating Icomplaints to reflect of the March 20, 2015 distribution of the ROIS was the responsibility of Griffin, or alternatively Quarles or Chandler. Uploading the ROI was the responsibility of Griffin or alternatively Chandler or Quarles.

Quarles knew all this on April 10, 2015. But admitting that either she or Griffin or Chandler was to blame for the failure to upload the ROI and update wouldn't have fit with her "purposes." Rather than acting in manner consistent with her authorized duties as Acting Team Lead, Quarles chose instead to lie and blame Stephens. This intentionally tortious, defamatory conduct was outside the scope of her employment under the Second Restatement and *Haddon*. Even assuming that this conduct passed the first prong of Restatement Section 229(1) as incidental to her position, her conduct fails under prongs 229 (2)(a)(e)(g) and (i). Not only that, but Quarles misrepresentation on April 10, 2015, violated her duty of care under Second Restatement Section 379(a). Thus, her tortious conduct is outside the scope of her employment.

The existing record contains sufficient evidence for the Court to rule on substitution. Assuming for the sake of argument that the Boente certification is prima facie evidence, the Plaintiff met his burden, introducing specific evidence challenging Boente perjured certification, shifting the burden to the Government. But Ms. Free's shoddy scope of employment failed to meet the Government's burden, in-so-far-as her Brief rests on conclusory statements, speculation, and professional unethical misstatements of the law. Because the Government has failed to meet its burden on scope and substitution, the Court should set aside the substitution.

Although such a ruling would set aside the substitution, it would not disturb the well-established conclusiveness of the certification for purposes of removal. As a result, the Court would retain jurisdiction over the case, resubstitute Ms. Quarles as the defendant and try the defamation case applying District of Columbia. This disposition of the case is consistent with the federal judiciary's policy preference regarding the "desirability of quickly resolving the scope-of-employment issue"[18] and "cognizan[ce] of the considerations weighing against protracted litigation under the *Westfall* Act.

### iii. The Court Should Order an Osborne Hearing on the Existing Record

In the alternative, the Plaintiff moves that the Court order an *Osborn* hearing on the existing record, resolving the scope-of-employment issue quickly, avoiding protracted litigation.

"If there is a material dispute as to the scope issue the district court must resolve it at an evidentiary hearing." Id. at 1509. In *Melo v. Hafer*, 13 F.3d 736 (3d Cir.1994), the Circuit stated:

> [i]f the Attorney General's certification is based on a different understanding of the facts than is reflected in the complaint, the plaintiff should be permitted reasonable discovery and should then be called upon to come forward, as if responding to a motion for summary judgment, with competent evidence supporting the facts upon which he would predicate liability, as well as any other facts necessary to support a conclusion that the defendant acted beyond the scope of his employment. Id. at 747.

A plaintiff challenging the government's scope-of-employment certification "bears the burden of coming forward with specific facts rebutting the certification," *McLachlan v. Bell*, 261 F.3d 908, 909-11 (9th Cir.2001). But because in some instances the plaintiff cannot discharge this burden without some discovery, a district court may permit limited discovery and hold an evidentiary hearing to resolve a material factual dispute regarding the scope of the defendant's employment. E.g, *Taboas v. Mlynczak*, 149 F.3d 576, 580-81 (7th Cir.1998).

---

[18]  *Gutierrez*, 111 F.3d at 1154-155.

The Plaintiff's burden of raising a material dispute regarding the substance of the Boente determination by alleging facts that, if true, would establish that the defendants were acting outside the scope of their employment. See *Kimbro*, 30 F.3d at 1508-09. "The issue is not whether the [P]laintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" Id. at 511. Consequently, to obtain discovery and an *Osborn* hearing, the Plaintiff need only have alleged sufficient facts that, taken as true, would establish that the defendants' actions exceeded the scope of their employment. Because the Plaintiff has done just that above, the Court should order an *Osborn* hearing.

If an *Osborn* hearing is held and the Court finds that Ms. Quarles acted outside her scope of employment, the Plaintiff moves that the Court deny the Government's motions for substitution and dismissal, that Ms. Quarles be resubstituted as the defendant in place of the United States that the Court try the defamation case applying District of Columbia law.


Respectfully submitted ,

By: _____

Glenn H. Stephens, III Ph.D.
210 East Fairfax Apartment 302
Falls Church, VA 22046
Tel: (202) 258-6521
Email: drghs3@gmail.com

DATE: July 5, 2015

29